IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GREGORY WAYNE KOZLOWSKI,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | |
| | | 16-cv-478-wmc |
| GREGORY VAN RYBROEK, *et al.*, | | |
| | Defendants. | |

---

In this civil action under 42 U.S.C. § 1983, *pro se* plaintiff Gregory Wayne Kozlowski brought First, Fifth, Eighth, and Fourteenth Amendment claims against a number of defendants allegedly involved in restricting his telephone, mail, and visitation privileges in response to his involvement in an escape attempt. In response to defendants' motion for summary judgment as to all claims (dkt. #8), Kozlowski now concedes that judgment should be entered against him as to: (1) his claims against defendants Michael Van Sistene and James Strand, who were involved in responding to Kozlowski's internal grievances; (2) his constitutional claims, other than those sounding under the First Amendment; and (3) his state law claims. (Dkt. #18.) As a result, what remains of Kozlowski's lawsuit are his First Amendment claims against defendants Gregory Van Rybroek, Paul Lane, Richard Schaller, Randy Klas and Patrick Cork, all of which arise out of institutional restrictions placed on his incoming and outgoing mail, calls and visits.

After considering the parties' summary judgment submissions as to these remaining claims, the court will grant defendants' motion with respect to plaintiff's challenges to restrictions on his incoming mail, calls and visits, while denying their motion as to outgoing

mail restrictions. If anything, on the record before the court, plaintiff appears likely to prevail as a matter of law with respect to the restrictions placed on his outgoing mail claims. Conversely, the record does not appear to support plaintiff's claim for punitive damages. Accordingly, pursuant to Fed. R. Civ. P. 56(f), the parties will be given an opportunity to address: (1) why judgment should not be entered against defendants as a matter of law on liability with respect to plaintiff's challenge to restrictions on his outgoing mail; and (2) whether the evidence of record precludes plaintiff from pursuing punitive damages at trial.

## UNDISPUTED FACTS[1]

**A.    Parties**

### 1.    Kozlowski

During all relevant times, Kozlowski was committed to the Department of Health Services ("DHS") under Wis. Stat. § 971.17, under a Not Guilty by Reason of Mental Disease or Defect ("NGI") Commitment. His NGI is a life commitment and he is currently housed at the Mendota Mental Health Institute ("Mendota"). Kozlowski has been diagnosed with schizophrenia, personality disorder with antisocial features, and substance abuse disorder. He also has a history of psychiatric hospitalizations.

Since the NGI finding, Kozlowski has been housed at different mental health facilities in Wisconsin, including Mendota from March 1984 to October 1998, and again from April 6, 2014, to the present date. At various times since December 1982, Kozlowski

---

[1] The court finds the following facts material and undisputed, unless noted otherwise.

has also been a patient at the Winnebago Mental Health Institute. During his most recent stay at Mendota, Kozlowski was placed in a medium security housing unit -- the Medium Admission and Rehabilitation Unit ("MARU").

### 2. Defendants

Dr. Van Rybroek has worked as the Director at Mendota since August of 2000. Dr. Lane has worked as the Deputy Director of Mendota since 2015. During the time relevant to Kozlowski's remaining claims, Lane has been Mendota's Program Director. Schaller was the security captain at Mendota at all times relevant to Kozlowski's claims. Richard Klas worked as the Unit Manager of Mendota's Secure Assessment Treatment Unit ("SATU") Unit. While Patrick Cork has been employed by DHS since 1997, since January 26, 2015, he has worked for DHS as the Administrator of the Division of Care and Treatment Services and was involved in handling Kozlowski's grievances.

## B. Mendota

Mendota is a DHS-operated psychiatric hospital that provides individualized and specialized care for patients with mental health needs. Mendota's patients are involuntarily detained or committed with complex behavioral problems under Wisconsin Statutes Chapters 51, 971, 975 and 938. Mendota currently has 16 separate, secure units totaling over 290 beds and an average daily population of 284 patients, putting it at or over capacity on a regular basis. One of the maximum security units, called the Assessment Treatment Unit ("ATU"), houses approximately 20 patients on a regular basis.

At Mendota, a Client Rights Limitation or Denial Documentation ("CRLD") may be issued to patients for a number of reasons, including pending investigations into security threats at the facility. CRLDs are issued for the temporary limitation or denial of a patient right, such as phone calls, visits or access to property. After issuance, a CRLD is monitored and reviewed at least on a monthly basis, depending on the circumstances. A CRLD is discontinued when conditions for restoration of the patient's rights have been met. Over the course of a year, approximately 50 CRLDs are issued.

Upon receipt of a CRLD, the patient is permitted an informal hearing. Wis. Stat. § 51.61(2). During that hearing, the patient receives the opportunity to ask questions and provide input. At the end of the hearing, the patient's rights may be restored, or the limitation or denial is either continued or modified.

## C.    July 9, 2014, Security Breach

During early morning perimeter checks on July 9, 2014, security discovered that three chain fences outside the courtyard of the ATU had been cut. These cuts were large enough that a patient could have escaped from Mendota. As a result, both the Madison Police Department and Mendota investigated the incident. At Mendota, security completed a census count and accounted for all patients. The Madison Police Department also dispatched a police K-9, which located a pair of wire cutters near the cuts in the fences.

During this investigation, Dr. Van Rybroek, Dr. Lane, and Mendota's deputy director at the time, Kathleen Bretl, placed Mendota on lockdown, which meant visits were temporarily stopped for all patients, patients could not access courtyards, and all patient

movement was stopped.  As a result of these lockdown measures, patients also could not perform their job duties nor attend treatment programming.

While patients were in the ATU courtyard on July 20, 2014, staff also discovered three buried weapons, including two sheathed hunting knives and a pair of wire cutters. Moreover, hidden inside one of the knife cases was a typed letter.

### D.    Investigation of Kozlowski

Very early in the investigation of the security breach, Mendota administration believed that a man named "Daniel C." was responsible for the actual fence cutting and that Kozlowski was implicated.  They came to this conclusion following their and the police departments' investigations of:  (1) Kozlowski's behavior surrounding a July 8 visit; and (2) Daniel C.'s behavior before and after that visit.  The location of the knives and wire cutters later found buried in the ATU courtyard, as well as the content of the accompanying letter, further supported the Mendota administration's ongoing investigation of Kozlowski's involvement in the fence cutting.

As for the July 8 visit, the July 9, 2014, progress notes related to that visit – labeled a "notable observation" – included the note that when Kozlowski learned he had a visitor and was transported to the visitors room, he "appeared very anxious – walking and talking at a more than usual quickened state." (Ex. 108 (dkt. #13-2) at 1.)  The July 9 note added that although Kozlowski brought along a pen and piece of paper to his visit with Daniel C., Kozlowski left with only the pen.  The next day, July 9, Kozlowski also received a phone call from a person named Daniel, and Kozlowski was overheard asking that person if he

"got home okay." Afterwards, Kozlowski continued to "act nervous," and he was asking questions about the possibility of his room being searched. (*Id.* at 3.)

Daniel C.'s own background and behavior likewise were integral to the conclusion that Kozlowski may have been involved in the fence cutting. For starters, Daniel had been previously found not guilty by reason of insanity ("NGI") for crimes involving criminal damage to property and arson, and had himself previously been a patient at Winnebago Mental Health Institute. As of his July 8 visit with Kozlowski, however, Daniel was out on conditional release.

On July 8, Daniel C. took a bus from Racine, where he was living, to visit Kozlowski. Daniel arrived at Mendota before visiting hours began, asking staff if he could walk around the property while waiting for the visit to start. Staff consented, but told him that he could not walk behind the buildings. A psychologist at Mendota also saw Daniel roaming the property for about an hour carrying a plastic bag. When he checked into the visiting room, Daniel commented to an officer, "[Y]ou sure have a lot of fences here. It's like a prison." (Van Rybroek decl. (dkt. #13) ¶ 18.)

Moreover, after Daniel C.'s visit with Kozlowski, his story about how and when he returned to Racine was inconsistent and ultimately a mystery. For example, when Daniel's agent asked him what bus he took home after the visit, Daniel first responded that he took a 9:00 p.m. Greyhound. When informed that the last Greyhound left before 7:30 p.m. (when he was still visiting Kozlowski), however, Daniel changed his response. He then stated that he took a Badger bus, even though no Badger bus left Madison after 7:30 p.m. that night either.

On July 17, 2014, Daniel C. was taken into custody in Kenosha after a person reported a suspicious person walking around with a suitcase. In the suitcase, police found a Taser and pepper spray. As a result, police arrested Daniel C. for Felony Possession of a Weapon. During the ensuing investigation, Mendota administration learned that the typing, font and content of the letter found inside one of the two knife cases in the ATU courtyard on Mendota property, along with the knives and wire cutters, was consistent with other correspondence found in Daniel's apartment.

On August 4, 2014, Madison police interviewed Daniel C., who said that he was friends with Kozlowski, having met him while they were both at Winnebago. Daniel also said that Kozlowski expressed his desire "to get out really bad, that he didn't care about anything but getting out….," but that he was not trying to break Kozlowski out because he was old and unable to escape. (Ex. 115 (dkt. #15-1) at 21-24.)

Finally, the Mendota defendants learned that the knives, wire cutters and letter were buried under the window of Kozlowski's longtime friend, James S., who was known to communicate with Kozlowski for improper purposes, including breaking policies related to sharing, borrowing and lending between patients, bringing in contraband, and creating liaisons with other patients, prisoners or the community. James S. had also completed multiple, successful escapes throughout his incarceration -- having escaped from a Pennsylvania prison and detention cell in 1964 -- and attempted multiple, unsuccessful escapes in Wisconsin since his own NGI commitment. Although Mendota staff had taken steps to separate Kozlowski physically from James, staff believed that they were still able

to communicate through three-way phone calls and by sending letters to each other through a third party.

Following the July 8 fence cutting, staff moved James S. to another room in his unit that did not overlook the courtyard. Mendota also repaired the fences, and it now uses non-lethal stun fencing along the four maximum security units.

## E.     Restrictions Placed on Kozlowski

Based on his behavior and the surrounding, suspicious circumstances, Kozlowski was transferred on July 9, 2014, from the medium-security MARU to the maximum-security SATU managed by defendant Klas. Within a week of July 9, Mendota ended its lockdown measures, but implemented changes to the phone call and visitation policies. In particular, Mendota started: (1) requiring all patients to create phone and visitor lists that must be approved by staff; and (2) limiting the number and duration of personal phone calls. However, Mendota did not lift any of the lockdown restrictions with respect to Kozlowski. Quite the contrary, Mendota administration determined that they needed to continue limiting Kozlowski's phone calls, visits and mail to reduce the risk of his potential escape, and to limit communication with any people outside of Mendota who could aid him in such an escape.

Accordingly, on July 9, 2014, Mendota administration directed SATU's unit manager Klas to issue Kozlowski two CRLD forms -- one prohibiting visitors and the other prohibiting non-legal phone calls. On July 10, 2014, Mendota administration further directed Klas to issue Kozlowski a CRLD denying him the ability to send or receive mail,

again except for legal mail.  Although Klas worked with Mendota administration with respect to the CRLD's by providing feedback, Klas did not authorize the CRLDs.

In support of defendants' motion for summary judgment, Dr. Van Rybroek submitted a declaration in his capacity as Mendota's Director, which explains the reasons why staff decided to continue these restrictions on Kozlowski's ability to communicate. With the exception of legal calls and legal mail, Van Rybroek states that it was necessary to limit Kozlowski's communications for a period of time given staff's belief that he could use family members or other to pass communications onto others with whom he conspired. In particular, Van Rybroek explains Kozlowski was known to call his brother, and then have his brother set up a three-way call, or to send his brother an envelope containing mail for other people.  He further declares that monitoring Kozlowski's communications was necessary because his associates often have criminal or questionable backgrounds, and they are willing to assist in schemes, which creates security risks.  In Van Rybroek's opinion, were Kozlowski allowed to send and receive mail without limitation, extensive monitoring would have been necessary.

Dr. Lane also submitted a supporting declaration, explaining the reasoning behind the three CRLDs issued as to Kozlowski in early July 2014.  With respect to the mail restriction specifically, Lane declares that the administration it was necessary due to the possibility that Kozlowski would communicate escape plans through the mail to work around the visit and call restrictions.  Lane further states that given the escape plot, Mendota administration felt all of these restrictions limiting Kozlowski's direct and

indirect communication with inmates and other patients were in the facility's and community's best interests.

After receiving the CRLDs, Kozlowski disputed them at an informal hearing. Specifically, Kozlowski appeared before Unit Manager Randy Klas and a Client Rights Facilitator for a hearing. Following that hearing, Kozlowski's CRLD's were not modified, although afterwards, Klas and Dr. Lane discussed all of the restrictions in the CRLDs on at least a weekly basis. Also on a weekly basis, Klas reviewed the visitor restriction with Kozlowski. Moreover, each CRLD was modified progressively over time to permit Kozlowski to engage in more communications. For example, on August 7, 2014, Dr. Lane authorized Kozlowski to receive visits from family only. Lane decided to permit this because Kozlowski has an on-going relationship with his brother and sister-in-law, and permitting him to see family members would permit Mendota staff to evaluate his behaviors once the restrictions were lifted.

As to the phone call CRLD, it was revised, by July 23, 2014, to allow Kozlowski to have two, monitored phone calls per week to his brother. Calls were not recorded, but were placed by staff to approved individuals, with staff monitoring the call nearby. By August 7, 2014, Dr. Lane revised the CRLD to allow Kozlowski to make or receive calls from family members, and on September 11, 2014, Lane revised the CRLD to permit Kozlowski to make business-related phone calls as well.

As to the mail CRLD, Dr. Lane authorized Kozlowski to receive mail from family members and his businesses by August 7, 2014. On September 5, 2014, Lane also permitted Kozlowski to send mail to family members and businesses.[2]

On September 9, 2014, Madison Police Detective Bauman, who was in charge of the investigation, sent Dr. Van Rybroek a letter stating that because of:

> the serious nature of this incident, including the cutting of three security fences and the discovery of two knives buried on campus, I would request that you maintain whatever security measures you have initiated as a response to this incident.
>
> This investigation remains active with suspect Daniel C's admitted friendship with MMH patient Greg Kozlowski, his admission that the two would correspond via mail and C's statement that Kozlowski expressed to him a strong desire to get out of Mendota. The continued monitoring of incoming and outgoing mail, changes in patient housing and any other security measures taken by you and your staff is appreciated.

(Ex. 109, dkt. #13-3; Van Rybroek decl., dkt. #13, ¶ 33.) Bauman also indicated that evidence was collected from the scene, but no DNA evidence could be recovered, including from the buried materials. On November 6, 2014, therefore, the Madison Police Department placed the case on inactive status, pending discovery of additional investigative leads. The investigation has not led to any criminal charges being filed against Daniel C., James S., Kozlowski or any other visitor or patient.

By December 2014, the phone call CRLD was discontinued altogether, permitting Kozlowski to make or receive phone calls as other patients do pursuant to Mendota policy. In contrast, the mail CRLD continued unchanged until March 2, 2015, when it was

---

[2] On October 30, 2014, at the request of Dane County Circuit Court Judge Genovese, the CRLD was modified to restrict Kozlowski from sending mail to her branch. Judge Genovese had reported to the Dane County Sheriff's Office that she had been receiving unwelcome letters from Kozlowski.

modified to allow all mail, except that no mail could be sent to or received from any Department of Correction ("DOC") facility, DHS facility or county jails. By April 4, 2015, the visitor CRLD was discontinued altogether. Finally, on August 2, 2016, a new CRLD was issued leaving the March 2, 2015, CRLD in place, except that Kozlowski now has monthly reviews of his current mail restriction with the program director. As a part of this review process, Kozlowski must participate in a psychological assessment to permit his treatment team to evaluate his treatment needs and dangerousness.

## F.     Kozlowski's Grievances

Kozlowski has filed several grievances challenging the CRLDs. Of relevance, on July 23, 2014, Kozlowski filed grievance 14-MMHI-318, complaining about restrictions on incoming and outgoing mail. James Strand investigated the grievance and upheld the CRLD. On October 15, 2014, Kozlowski initiated grievance 14-MMHI-441 by complaining that staff were holding his mail, as well as opening, reading and destroying his mail. Strand responded that this concern was part of 14-MMHI-318, but nonetheless addressed the substance. First, Strand explained that the only mail being held was "mail that does not contain a return address, mail from an inmate at a correctional facility or mail from an individual that the treatment team does not know or recognize .... All other mail (personal, family, legal, etc.) is being given to you as it comes in." (Dkt. #14-3.) With respect to sending out several small envelopes inside a larger envelope, Strand advised that Kozlowski "would need to allow staff to observe what [he is] putting into the smaller envelopes before sealing them." (*Id.*) Strand added that "[s]taff will not read anything

that you put in, but they need to see what you are putting into the envelopes to verify that it is not any type of contraband." Kozlowski appealed this decision. Dr. Rybroek responded to his appeal by repeating the types of incoming mail being withheld, but added that some of his mail had mistakenly been sent to the Winnebago Mental Health Institute where he had previously resided.

Kozlowski appealed the adverse decisions in 14-MMHI-318 and 14-MMHI-441.[3] On September 16, 2015, Van Sistine dismissed his grievances about the calls and visits, but he concluded that Mendota could not limit Kozlowski's mail using the CRLD process, because Wis. Stat. § 51.61(1)(cm) explicitly provides that Chapter 980 patients have rights to send and receive mail. Van Sistine found that Mendota could not use a CRLD process to limit mail based on its interpretation of *West v. Macht*, 237 Wis. 2d 265 (2000), in which the Wisconsin Court of Appeals suggested, but did not conclude, that the CRLD process could be used to restrict mail. (Ex. 111 (dkt. #14-2) at 27.) Even so, Van Sistine cautioned Kozlowski that Mendota staff still had options to address its security concern, such as staff examination of mail if there was suspicion that it contained contraband. Van Sistine also offered another alternative: staff could ask the mail recipient if they could read the mail.

Mendota then appealed Van Sistine's decision, and on April 28, 2016, Cork upheld the CRLD, including certain directives. (Ex. 111 (dkt. #14-2) at 32-33.) More specifically, Cork affirmed the decision in 14-MMHI-318 as moot, since the CRLD had by then been

---

[3] For appellate purposes, Van Sistine consolidated these grievances with two others -- 14-MMHI-338 and 14-MMHI-420 -- that were essentially repetitive.

revised to permit Kozlowski to exchange mail with family members. With respect to 14-MMHI-441, Cork acknowledged that using a CRLD to limit mail was problematic under Wis. Stat. § 51.61(1)(cm) and the decision in *West*. However, he concluded that Mendota staff's decision to limit Kozlowski's mail using a CRLD was proper *in that instance* based on the security concern. In his view, limiting the CRLD to preclude just mail to inmates at DOC institutions and other DHS patients did not violate Wis. Stat. § 51.61(1)(cm). That said, Cork also directed Mendota to issue a new CRLD within a reasonable amount of time that included a process for Kozlowski to follow in order to reduce the restrictions within the CRLD.

OPINION

Plaintiff is pursuing First Amendment claims against Dr. Gregory Van Rybroek, Dr. Paul Lane, Richard Schaller, Randy Klas and Patrick Cork for their involvement in imposing the restrictions on his incoming and outgoing mail, visit and calls. Defendants seek judgment on the merits and on qualified immunity grounds. Because the First Amendment standard for restrictions on calls, visits and incoming mail differs from the standard applicable to outgoing mail restrictions, the court will address them separately.

I.      Restrictions Calls, Visits and Incoming Mail

The First Amendment's guarantee of freedom of speech provides protection from censorship of a prisoner's incoming and outgoing correspondence. *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) (citing *Turner v. Safley*, 482 U.S. 78 (1987); *Thornburgh v. Abbott*,

490 U.S. 401 (1989)).  A prison's restriction on an inmate's speech may be upheld under the First Amendment, however, if it is reasonably related to a legitimate penological interest.  *Turner*, at 89.  In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors:  (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) what impact accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right.  *Id.*

The "first factor weighs particularly heavily in the balance and is often viewed as a 'threshold' factor that can be dispositive for either party." *Jones v. Russell*, 149 F. Supp. 3d 1095, 1100, 2015 WL 8485274 (W.D. Wis. 2015) (citations omitted).  Here, the defendants' restrictions placed on Kozlowski's calls, visits and incoming mail consistently bore a logical connection to Mendota's legitimate -- and quite serious -- security interests.

While Kozlowski denies that he was involved in the fence cutting, the undisputed evidence clearly supports a finding by Mendota and the defendants that his contact with other patients and visitors posed a legitimate security risk.  To that point, the evidence indicates that staff reasonably believed Daniel C. to be involved in the fence cutting:

- Staff noted that Daniel acted in a suspicious manner, walked around the property with a bag and commented on the amount of fences at Mendota to staff there.

- Daniel changed his story about when he visited Kozlowski and how he got home afterwards.

- Evidence found two weeks later, including weapons and a note buried in the lawn at Mendota, implicated Daniel in the fence cutting.

Staff likewise had plenty of facts to conclude that Kozlowski was involved:

- Kozlowski appeared unusually nervous during his visit with Daniel C.

- Daniel told a Madison Police detective that Kowalski told him he "wanted to get out really bad, that he didn't care about anything but getting out."

- The knives and wire cutters were found outside of James S.'s window, a patient known to be friends with Kozlowski and had attempted escape on multiple occasions in the past.

- Madison police informed Dr. Van Rybroek in September of 2014 that the investigation into Kozlowski and Daniel C. was ongoing and specifically requested continued monitoring of incoming and outgoing mail, as well as "any other security measures" deemed appropriate by staff.

Plaintiff offers no evidence that undermines any of the Mendota staff's security concerns. Instead, Kozlowski asserts flatly that he was not involved in the fence cutting. Yet the inquiry for purposes of these restrictions is not whether Kozlowski was *actually* involved in the security breach, but rather what Mendota administration reasonably believed about his involvement under all the circumstances. *See Hadi v. Horn*, 830 F.2d 779, 785 (7th Cir. 1987) (proof not required before taking steps to minimize security risks).

Here, Kozlowski has submitted no evidence suggesting that Mendota staff was not due some deference in the exercise of their professional judgment as to Kozlowski's likely involvement and need for restrictions on his ongoing communications. *See Youngberg v. Romero*, 457 U.S. 307, 323(1996) ("we emphasize that courts must show deference to the judgment exercised by the qualified professional").

Defendants similarly submitted persuasive evidence that restricting Kozlowski's calls, visits and incoming mail was directly related to addressing Mendota's security

interest. To this latter point, Mendota staff knew that Kozlowski used his brother to mail items to third parties and to set up phone calls involving third parties. They further understood on credible evidence that Kozlowski communicated with James S. and a "network" of other inmates and patients for the purpose of subverting Mendota policies. In their view, completely blocking Kozlowski's ability to take action directly or indirectly by limiting his calls, visits and mail -- *on a temporary basis* -- was a logical step in stopping him from communicating with others who may engage in conduct similar to Daniel C.'s.

While a jury might conceivably believe that Kozlowski was not involved in the fence cutting, that is not dispositive because he has submitted *no* evidence calling into question defendants' good faith belief that Kozlowski's actions must be restricted, at least in the near term, based on a significant amount of evidence suggesting that Kozlowski was at least tangentially involved in the fence cutting, including through the use of institutional visits, call and incoming mail. Nor has Kozlowski submitted any evidence undermining the Mendota staff's reported, ongoing efforts with Kozlowski to lift restrictions, while contemporaneously considering the legitimate security risk he posed. To proceed past summary judgment, Kozlowski had to demonstrate affirmatively at least what evidence supports his claims. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (describing summary judgment as "the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). As to the first *Turner* factor, Kozlowski has wholly failed to make the necessary showing. The same is true for the second, third and fourth *Turner* factors, at least as to it

concerns CRLDs restricting calls and visits, since he simply disputes the need for such restrictions in the face of substantial, contrary evidence.

However, the incoming mail restriction requires a closer look as to the remaining *Turner* factors. In particular, Kozlowski has a point with respect to the "possible alternative" factor. For example, Mendota staff could have required Kozlowski to open incoming mail in the presence of staff members, or to submit a list of DHS patients and DOC inmates he wishes to correspond with for staff approval. Unfortunately for plaintiff, that leads to consideration of the third *Turner* factor, because these proposed alternatives would require additional staff resources, and therefore have a detrimental effect on the facility, either by increasing costs or taking time and attention away from other patients. As to the final *Turner* factor, Mendota administration credibly claims that Kozlowski's incoming mail could cause another security breach, making it substantially less feasible for Mendota to address its security concerns without limiting Kozlowski's right to receive mail.

The result here might be different if *any* evidence existed that tended to exonerate plaintiff. As of September of 2014, however, the results of the investigation left Mendota staff with strong circumstantial evidence suggesting that Kozlowski had used *and* would continue to use incoming mail, calls and visitors for purposes that could lead to another, very serious security breach. So, too, might Kozlowski have had an argument if the restrictions on these forms of communication have continued indefinitely or in a more sweeping fashion, but neither is true on this record. As such, when considering all of the *Turner* factors, no reasonable jury could find that defendants' limitations on plaintiff's calls, visits or incoming mail constituted an unreasonable impingement of plaintiff's First

Amendment rights. Finally, even if a jury *could* so find, the actions by the defendants' here, responding as they were to serious breaches of institutional security, were not so obvious as to constitute a violation of plaintiff's clearly established First Amendment rights, precluding any award of monetary damages for the reasons set forth in section III of this opinion below.

## II.    Outgoing Mail

The remaining question with respect to Kozlowski's First Amendment claim runs into more clearly established constitutional law, as defendants' restrictions on Kozlowski's *outgoing* mail faces a more demanding First Amendment standard. Generally speaking, restrictions on outgoing mail in this setting must: (1) promote "one or more of the substantial governmental interests of security, order, and rehabilitation," *and* (2) be "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez,* 416 U.S. 396, 413 (1974). Officials may not censor correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. *See Thornburgh v. Abbott,* 490 U.S. 401, 423 (1989) (citing *Procunier,* 416 U.S. at 412).

Here, there is no reasonable doubt that restrictions on Kozlowski's outgoing mail were related to a substantial security interest. The July 9 incident presented Mendota staff with two undoubtedly significant security concerns: (1) the escape of patients from the facility and (2) the smuggling of contraband, including of multiple dangerous weapons, to patients housed in a high security area at Mendota. However, defendants have so far failed

to meet the second prong of the *Procunier* standard, because the record does not support the conclusion that the outgoing mail restrictions were "no greater than necessary."

While no direct evidence supports a finding that Kozlowski sent Daniel C. a letter asking him to cut the fences, Mendota staff knew that: (1) Kozlowski communicates with other patients (James S.) and a network of inmates and patients for improper purposes; and (2) Kozlowski previously used his brother to communicate with third parties. Thus, it took a small inferential step for them to believe that Kozlowski might send mail in an attempt to carry out another escape plan or smuggling operation. Moreover, the restrictions in the challenged CRLD did not stop him from sending *all* mail, since he always retained the right to send legal mail. Further, as of September 5, 2014, Kozlowski could also send mail to family members and businesses; and starting March 2, 2015, he could send any mail, except for other patients or county jail or DOC inmates.

Still, this leaves a question: why not simply screen Kozlowski's outgoing mail? The court finds itself with little concrete evidence in defendants' favor on this subject. In fact, evidence supports a finding that the outgoing mail restrictions were fatally overbroad. For example, Dr. Van Rybroek declares, without elaboration, that screening Kozlowski's outgoing mail would require routing resources away from patient care and treatment, and defendants argue in their brief that Kozlowski could have used code in his outgoing mail to subvert staff. However, defendants provide *no* evidence supporting the conclusion that either concern made screening impossible. For example, there is no evidence about the potential cost of screening his mail, such as an explanation of how often Kozlowski sends outgoing mail or details about the staffing or financial requirements and limitations this

would present at Mendota. Further, defendants have submitted no evidence of instances where Kozlowski used code in his outgoing mail or undertook other means of subterfuge, with the exception of suspected communications within communications. Thus, while the court has accepted that screening Kozlowski's mail would present a burden to Mendota staff for purposes of the *Turner* factors, defendants have not established that it was or would be unworkable in any measureable way. Without more context or specifics from Mendota staff, therefore, the court cannot conclude that the screening option was unfeasible.

If anything, Van Sistene's and Cork's analyses of Kozlowski's grievances actually appear to support the opposite conclusion. Van Sistene determined that the mail CRLD was inappropriate and suggested that Mendota staff either review Kozlowski's mail for contraband or ask the recipient to read it for security issues. While Cork ultimately reversed Van Sistene's conclusion, he found that the mail restriction here was an appropriate "one-time" exception, but in so finding failed to explain (or even address) *why* Van Sistene's proposed alternative was not feasible in April of 2016, *almost two years* after the security breach occurred.

Defendants may have a more substantial and specific explanation that could satisfy the *Procunier* standard, but that information is not part of the current record. If no such evidence as to Kozlowski's outgoing mail restrictions can be proffered, judgment may even be appropriate in plaintiff's favor. As contemplated by Rule 56(f), however, the court will provide both parties the opportunity to submit any additional law or facts related to this claim before deciding the issue.

### III. Qualified Immunity

Defendants also argue that qualified immunity shields them from monetary damages here, but the record currently supports their position only as to the incoming mail, call and visit restrictions. Qualified immunity protects government employees from liability for civil damages for actions taken within the scope of their employment unless their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "In determining whether a constitutional right has been clearly established, it is unnecessary for the particular violation in question to have been previously held unlawful." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Instead, the question is whether the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

As to the visit, call and incoming mail restrictions, the court agrees that the restrictions were appropriate under the clearly established *Turner* factors, and Kozlowski has failed to cite to any case holding that their decisions to impose, implement and modify Kozlowski's CRLDs with respect to these forms of communication violated a clearly established right. As such, judgment in defendants' favor with respect to these restrictions is appropriate generally, and certainly as it concerns any claim to monetary damages.

As to the outgoing mail restrictions, however, qualified immunity does not appear to shield them from an award of monetary damages, at least on the record to date. When defendants imposed and carried out the CRLD with respect to outgoing mail, First

Amendment case law had already clearly established that such a restriction must: (1) further an important or substantial government interest; and (2) be "no greater than is necessary or essential to the protection" of that interest. *Koutnik*, 456 F.3d at 784. As defendants have yet to submit evidence supporting a finding as to this second prong, qualified immunity does not shield them from the possible award of money damages.[4] Regardless, Kozlowski is seeking not only monetary damages but also injunctive relief, since he is requesting a change to his continuing mail CRLD, permitting him to send mail to certain inmates and patients. Accordingly, even if qualified immunity applied here, the court could not enter judgment in defendants' favor.

## IV.     Punitive Damages

Assuming the parties' submissions confirm the court's impression that judgment in plaintiff's favor as to the outgoing mail restriction is appropriate, that would leave a final issue at trial as to plaintiff's request for injunctive and monetary relief. The court could certainly craft an appropriate injunction, and plaintiff would appear to be entitled to nominal, compensatory damages only because he alleges no physical injury. *See* 42 U.S.C. § 1997e(e). This would leave punitive damages as the only question for a jury. However, while the outgoing mail restriction may fall under the demanding *Procunier* standard, the record does not suggest that plaintiff is entitled to punitive damages. On the contrary, the evidence of record tends to support a conclusion that any continuing prohibition on outgoing mail, while likely unconstitutional, is the product of a series of careful and

---

[4] Having said that, the court will not speculate what compensatory damages might be here, if any.

deliberate decisions, *not* malice, bad faith, or even a reckless disregard of Kozlowski's constitutional rights. *See Wright v. Miller*, 561 F. App'x 551, 555-56 (7th Cir. 2014) ("[T]o award punitive damages, a jury must find that [the defendant] was 'motivated by evil intent' or acted with 'reckless or callous indifference' to [the plaintiff's] constitutional rights.") (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Therefore, the court is having difficulty seeing how a reasonable jury could award punitive damages here, and defendants may be entitled to judgment in their favor on this issue. Again, however, the court will ask the parties to submit argument and evidence on the availability of compensatory or punitive damages before deciding this issue pursuant to Rule 56(f).

## ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment (dkt. #8) is GRANTED in part and DENIED in part, as follows:

    a.  Judgment is GRANTED in favor of defendants as to:

        i.  Plaintiff's state law, Eighth Amendment, Equal Protection and Substantive Due Process claims;

        ii.  All of plaintiff's claims against defendants Michael Van Sistine and James Strand; and

        iii.  plaintiff's First Amendment claim related to restrictions placed on his calls, visits and incoming mail.

    b.  Judgment is DENIED as to plaintiff's First Amendment claim related to restrictions placed on his outgoing mail.

2.  Defendants' brief and supporting materials as to (i) why this court should not enter judgment in plaintiff's favor on his First Amendment claim related to his outgoing mail restrictions, and (ii) the availability of compensatory or punitive damages, is due on or before **November 14, 2017;** plaintiff's response on both issues is due on or before **November 28, 2017**.  No reply will be permitted without advance leave of this court.

3.  All other deadlines, including the trial date, remain unchanged.  As such, defendants' motion to stay (dkt. #23) is DENIED.

Entered this 31st day of October, 2017.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge