IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GREGORY WAYNE KOZLOWSKI,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | |
| | | 16-cv-478-wmc |
| GREGORY VAN RYBROEK, *et al.*, | | |
| | Defendants. | |

---

In this civil action under 42 U.S.C. § 1983, *pro se* plaintiff Gregory Wayne Kozlowski brought constitutional challenges to restrictions placed on his telephone, mail, and visitation privileges at the Mendota Mental Health Institute ("Mendota") after his involvement in an escape attempt on July 9, 2014. On October 31, 2017, the court issued an opinion dismissing all of plaintiff's claims except his First Amendment claim challenging the restrictions placed on his outgoing mail. (Dkt. #24.) Based on the record then before the court, it further directed the parties to brief two issues: (1) why judgment should not be entered against defendants as a matter of law on liability with respect to plaintiff's remaining claim; and (2) whether the evidence of record precludes plaintiff from pursuing punitive damages at trial. Defendants responded on November 8, 2017, and plaintiff submitted his response on December 1, 2017. For the following reasons, the court concludes that while the outgoing mail restriction violates Kozlowski's First Amendment rights, defendants are immune from liability for money damages. The court will, however, seek further input from the parties with respect to Kozlowski's request for injunctive relief.

The court incorporates the undisputed facts from its previous opinion, but will only repeat the facts relevant to the outstanding issues for context.

## I.  Kozlowski's Background, Diagnosis and Behavior

During all relevant times, Kozlowski was committed to the Department of Health Services ("DHS") for life following a finding of Not Guilty by Reason of Mental Disease or Defect ("NGI") under Wis. Stat. § 971.17, a finding made after Kozlowski was convicted of killing a person in 1972.  Kozlowski also admitted to killing a woman in 1970 while on active duty in Vietnam.  Since his NGI life commitment, Kozlowski has been housed at different mental health facilities in Wisconsin, including Mendota from March 1984 to October 1998, and again from April 6, 2014, to the present.

Kozlowski has been diagnosed with schizophrenia, significant personality disorder with antisocial features, and substance abuse disorder.  He also has a history of psychiatric hospitalizations.  According to Kozlowski's current treating psychiatrist, Dr. Laurence Trueman, Kozlowski has exhibited psychopathic traits, "such as grandiose sense of self-worth, pathological lying, manipulation, lack of guilt and remorse, lack of empathy, failure to accept responsibility, and prior failure at conditional release."  (Trueman Decl. (dkt. #34) ¶ 113.)  Unlike most, Dr. Trueman further opines that Kozlowski's personality disorder directly relates to his dangerousness, and although Kozlowski's prescribed medications treat his psychosis, medication cannot treat his personality disorder.  In

---

[1] The court finds the following facts material and undisputed, unless noted otherwise.

particular, Trueman concludes that he considers Kozlowski a dangerous individual who presents a significant threat to the community, because it is difficult to predict whether he will kill again.

## II.     The Mail CRLD Time Line

On July 10, 2014, immediately following the July 9 security breach, Mendota administration imposed a Client Rights Limitation or Denial Documentation ("CRLD") on Kozlowski prohibiting him from receiving or sending mail, except for legal mail.

By August 7, 2014, Dr. Lane had authorized Kozlowski to receive mail from family members and his businesses.  On September 5, 2014, Lane also permitted Kozlowski to send mail to family members and businesses.  In Dr. Lane's supplemental declaration, he states that they permitted him to send these types of mail, including to his brother, despite an ongoing concern that Kozlowski would use that longstanding relationship to send mail to third parties and legitimate business interests.  Nevertheless, Dr. Lane further explains that Mendota maintained the prohibition on mail to other patients, DOC inmates and jail prisoners because evidence showed that Kozlowski had plotted the escape with another former patient, Daniel C., and possibly another Mendota patient, James S.  The mail CRLD continued unchanged until March 2, 2015, when it was modified to allow all mail, except that mail could not be sent to or received from any DOC facility, DHS facility or county jails.

Throughout this time, Kozlowski challenged the CRLD's through Mendota's grievance process, with some success.  After receiving adverse decisions in 14-MMHI-318 and 14-MMHI-441, Kozlowski appealed.  On September 16, 2015, Client Rights

Specialist VanSistine found in Kozlowski's favor as to the mail restriction. In particular, VanSistene concluded that Mendota could not limit Kozlowski's mail using the CRLD process, because Wis. Stat. § 51.61(1)(cm) explicitly provides that Chapter 980 patients have rights to send and receive mail. Furthermore, VanSistine found that Mendota could not use a CRLD process to limit mail based on its interpretation of *West v. Macht*, 237 Wis. 2d 265 (Wis. Ct. App. 2000), in which the Wisconsin Court of Appeals suggested, without deciding, that the CRLD process could be used to restrict mail. (Ex. 111 (dkt. #14-2) at 27.) Even so, VanSistine cautioned Kozlowski that Mendota staff still had the ability to address its security concern, such as staff examination of his mail if there was suspicion that it contained contraband.[2]

Disagreeing with VanSistine's decision, Mendota appealed. On April 28, 2016, Patrick Cork overturned the decision and upheld the CRLD, with certain directives. (Ex. 111 (dkt. #14-2) at 32-33.) Cork acknowledged that using a CRLD to limit mail was problematic under Wis. Stat. § 51.61(1)(cm) and the *West* decision. However, he concluded that Mendota staff's decision to limit Kozlowski's mail by CRLD was proper *in that instance* based on a specific security concern. In his view, limiting the CRLD to preclude *just* mail to inmates at DOC institutions or other DHS patients did not violate Wis. Stat. § 51.61(1)(cm). That said, Cork still directed Mendota to adopt a new CRLD process within a reasonable amount of time that would allow Kozlowski to seek a reduction in the restrictions under the CRLD.

---

[2] VanSistine also offered another alternative, where staff would ask the mail recipient if they could read the mail.

On August 2, 2016, following resolution of Kozlowski's grievances, a new CRLD was issued leaving the March 2, 2015, CRLD in place, except for a modification informing Kozlowski that he can take steps to have the restrictions lifted. More specifically, the CRLD requires Kozlowski to comply with a psychological assessment, a process that would normally take a total of three to five hours over time. This assessment would include: "a psychological profile, personality profile, evaluation of risk, including dangerousness, and IQ test." (Lane Supp. Decl. (dkt. #33) ¶ 7.) Dr. Lane explains why such an assessment is necessary: Kozlowski has participated in some psychoeducational treatment, such as life skills, but has not agreed to psychological treatment that would expose him to psychotherapy or group therapy treatment. Dr. Lane states that although Kozlowski meets with a psychologist for supportive therapy, that treatment does not assess his specific pathology, something he feels is necessary before all outgoing mail to DOC or DHS confined persons can be safely approved. Regardless, this August 2, 2016, CRLD remains in place.

III.    **Mendota's justifications for the outgoing mail prohibition**

As previously noted, Dr. Van Rybroek submitted a declaration in his capacity as Mendota's Director, explaining the reasons for the decision to continue restrictions on Kozlowski's outgoing mail. Given staff's belief that Kozlowski's could use family members or others to pass on communications to those with whom he conspired, Van Rybroek states that it was necessary to limit his communications for a period of time. By way of explanation, Van Rybroek emphasizes Kozlowski was known to send his brother an envelope containing mail for other people. He further declares that monitoring

Kozlowski's communications was necessary because his associates often have criminal or questionable backgrounds, and they are willing to assist in schemes that create security risks. In Director Van Rybroek's opinion, were Kozlowski allowed to send and receive mail without limitation, extensive monitoring would have been necessary.

Dr. Lane also provided an earlier declaration as to the reasoning behind the CRLD generally, and now submits a supplemental declaration with more specific information. With respect to the mail restriction, Lane declares that the administration felt that the mail restriction was necessary due to the possibility that Kozlowski would communicate escape plans through the mail to work around the visit and call restrictions. Lane further states that given the escape plot, Mendota administration felt all of these restrictions limiting Kozlowski's direct and indirect communication with inmates and other patients were in the facility's and community's best interests. In his supplemental declaration, Lane adds that "[t]he [Mendota] facility was very vulnerable" immediately after the July 9 security breach, *and* available evidence about the escape suggested that James S., a longtime friend of Kozlowski, was involved. As a result, limiting Kozlowski's communications was seen as appropriate, particularly given Kozlowski's "history of corresponding with inmates and patients for improper purposes." (Lane Supp. Decl. (dkt. #33) ¶ 5.)

Dr. Lane also offers multiple explanations as to why the prescreening of Kozlowski's mail was not, and is not, feasible. First, he states that under Wis. Stat. § 51.61(1)(cm)1, Mendota staff may not read patients' mail. Lane acknowledges that the statute does not prohibit screening mail for contraband, and he does not address whether a patient can waive this restriction in exchange for unblocking their mail. Lane does add that asking the

letter recipient to read and approve Kozlowski's mail is not a viable option because the recipient would be too difficult to track down, and if a friend of Kozlowski's, also unlikely to disclose the content of the correspondence voluntarily. Even if staff could review the content of the outgoing mail, Dr. Lane states that "Kozlowski could avoid detection of his illicit activities by writing in code," using "benign phrases which the recipient could know to mean something else." (Lane Supp. Decl. (dkt. #33) ¶ 14.) In Lane's opinion, Kozlowski is "intelligent enough and pathological enough to engage in such a tactic." (*Id.* ¶ 15.)

While Lane does not provide specific examples of Kozlowski actually employing such sophisticated tactics for an improper purpose, he does provide information about Mendota's limited ability to review Kozlowski's outgoing mail. Because Kozlowski "writes a lot of letters," Lane opines that it would be necessary to hire someone to review them and discern whether each communication presented a security risk. Lane further states that Mendota is short staffed, with a 17% vacancy in line staff, and Mendota lacks budgetary resources to create a new position for someone to review Kozlowski's outgoing mail. Indeed, he explains that any additional money would be used to address more urgent needs, such as hiring direct care staff and nurses, rather than paying to have someone review patient mail. Finally, Lane adds that Mendota does not currently have any staff with the requisite training to screen for hidden messages.

IV. **Kozlowski's current status**

The progress notes related to Kozlowski's treatment include an entry from July 26, 2016, in which staff informed him that the CRLD restricting his incoming and outgoing mail could be modified or even lifted, but it would require that he participate in a

psychological evaluation. (Ex. 117 (dkt. #37-1) at 4.) The note also indicates that Kozlowski reacted poorly to the requirement, stating that "It's a way to try and validate unvalidated opinions." (Nelson Decl (dkt. #37) ¶ 6; Ex. 117 (dkt. #37-1) at 4.) According to Dr. Lane, Kozlowski remains unhappy with the psychological assessment requirement and continues to refuse to take part in it. As a result, he continues to be subject to restrictions on his outgoing mail.

Kozlowski does attend monthly meetings with the program director, his social worker and a client rights facilitator. During those meetings, he can discuss the mail restriction, but he has not agreed to participate in a psychological assessment. At one of these meetings in March of 2017, Kozlowski wondered about his ability to send money to another inmate. The upshot of that discussion was that Kozlowski was ultimately permitted to send money to the business office at Stanley Correctional Institution ("Stanley") to be deposited into an inmate's account. That inmate was Joel Flakes, who Kozlowski explains is his fiancé, with whom he has been involved for many years.

For his part, Kozlowski avers that he was "never offered any assessment for restoring" his mail rights, although he claims to have believed that his sessions with Dr. Michael Hammer were meant to help him progress to lifting the mail CRLD. Kozlowski adds that in September of 2014, he wrote Dr. Lane a letter to inform him of his romantic relationship with Flakes. Kozlowski also purports to have explained to Lane that Flakes was an important source of health and stability, and further that Flakes relied on him for financial support. Kozlowski also continues that the only communication defendants have allowed with Flakes has been to send him money.

Finally, Kozlowski states that he is willing to waive the requirements of Wis. Stat. § 51.61(1)(cm)1, and that he has offered on multiple occasions to permit staff at Mendota read his outgoing mail to DOC prisoners or DHS patients *before* the envelope is sealed. As Lane confirms, those requests have been refused. Relatedly, Kozlowski states that he would be willing to submit a list of individuals with whom he would like to correspond that could be reviewed and approved by the institution on an individual basis. That request has also been rebuffed.

## OPINION

### I.    Outgoing Mail Restriction

Having considered the parties additional proposed findings and argument, the court concludes that Kozlowski's First Amendment claim succeeds on the merits, but that the defendants are entitled to qualified immunity, thus shielding them from monetary damages.[3] As previously explained, defendants' restrictions on Kozlowski's outgoing mail faces a demanding First Amendment standard, even in a penal setting. Generally speaking, prison restrictions on outgoing mail must: (1) promote "one or more of the substantial governmental interests of security, order, and rehabilitation," *and* (2) be "no greater than

---

[3] Previously the court concluded that the outgoing mail CRLD was and is the product of a series of careful and deliberate decisions by Mendota staff precipitated by Kozlowski's and there appeared to be no evidence that defendants acted with malice, bad faith, or even a reckless disregard of Kozlowski's constitutional rights. *See Wright v. Miller*, 561 F. App'x 551, 555-56 (7th Cir. 2014) ("[T]o award punitive damages, a jury must find that [the defendant] was 'motivated by evil intent' or acted with 'reckless or callous indifference' to [the plaintiff's] constitutional rights.") (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Although the court need not definitively decide this issue given its finding that defendants are entitled to qualified immunity, it is worth noting that Kozlowski has yet to submit any evidence or argument that would support a finding to the contrary.

is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez,* 416 U.S. 396, 413 (1974). In formulating this standard, the Supreme Court recognized that "[s]ome latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty." *Procunier,* 416 U.S. at 414. The Supreme Court has also clarified that the "no greater than necessary" standard is not as demanding as the strict scrutiny "least restrictive means" requirement; rather, the primary focus is whether the restriction actually responded to a "threat to prison order and security" *inside* the prison. *See Thornburgh v. Abbott,* 490 U.S. 401, 412 (1989) (citing *Procunier,* 416 U.S. at 412). Given the Court's focus on an actual threat to security in the institution, the distinction *Procunier* recognized between incoming and outgoing mail makes sense because "[d]angerous outgoing correspondence is more likely to fall within readily identifiable categories: … escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion." *Id.*

Citing *Turner v. Safley*, 482 U.S. 78 (1987), defendants argue this standard is satisfied here because the outgoing mail restriction is directly related to institution order and security, and it only prevents Kozlowski from sending mail to other prisoners and patients. In their summary judgment briefing, therefore, defendants urge the court to reconsider its application of the *Procunier* standard to Kozlowski's outgoing mail restriction, which the court will undertake. In *Turner*, one of the challenged prison restrictions limited inmate-to-inmate correspondence across correctional institutions in the Missouri prison system. *Id.* at 81-82. Even so, the regulation permitted correspondence with inmates in

other institutions in three, different circumstances: (1) the inmates are immediate family members; (2) the inmates are writing about legal matters; or (3) the "classification/treatment team of each inmate deems it in the best interest of the parties involved." *Id.* Certainly, *Turner* is important to deciding this case in that it, too, dealt with communications between inmates at other institutions and similar security concerns. Yet even *Turner* adopted some exceptions to the prohibition on outgoing mail to other institutionalized persons.

Subsequent to the *Turner* decision, the Supreme Court also decided *Thornburgh*, reaffirming the application of the *Procunier* standard to "regulations concerning outgoing correspondence" because:

> The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials. Any attempt to justify a similar categorical distinction between incoming correspondence from prisoners (to which we applied a reasonableness standard in *Turner*) and incoming correspondence from nonprisoners would likely prove futile, and we do not invite it.

490 U.S. at 414. Then, in *Shaw v. Murphy*, 532 U.S. 223, 225 (2001), the Court further emphasized that *Turner* applied to "prisoners' communications to other inmates" in the same institution. Defendants cite the holding in *Shaw*, but the Supreme Court did not focus on whether the two inmates were in the same institution to determine that *Turner* applied, perhaps because the two inmates involved were incarcerated at the same prison but in separate wings, precluding them from meeting in person. *See Murphy v. Shaw*, 195 F.3d 1121, 1123 (9th Cir. 1999). Thus, the *Shaw* decision did not limit application of the *Procunier* standard to a greater degree than *Thornburgh*.

In *Koutnik v. Brown*, 456 F.3d 777 (7th Cir. 2006), the Seventh Circuit discussed the limited import of *Shaw* on outgoing mail restrictions, concluding that a restriction on a prisoner's outgoing mail to a company required analysis under the *Procunier* standard. In a footnote, the court also noted that defendants' reliance on *Turner*:

> In essence, they maintain that *Shaw* operated as a de facto overruling of *Procunier v. Martinez*, 416 U.S. 396, 94 S. Ct. 1800, 40 L.Ed.2d 224 (1974). We decline this invitation.
> ....
>
> The [*Shaw*] Court, however, determined that *Turner* provided the appropriate analytical framework and "decline[d] to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech." *Id.* at 231, 121 S. Ct. 1475. *Shaw,* therefore, did not address the right of prisoners to send mail outside the prison — the regulation of which is governed by the *Martinez* standard. Furthermore, as noted above, after the Court handed down *Shaw,* other courts of appeals have applied the *Martinez* standard, not the *Turner* standard, to evaluate the regulation of prisoners' outgoing mail.

*Id.* at 784 n.4. In *Koutnik*, the Seventh Circuit relied on other court of appeals decisions: *Nasir v. Morgan*, 350 F.3d 366, 369, 374-75, (3d Cir. 2003), which upheld a restriction on an inmate's ability to communicate with a *former* prisoner; and *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 878 (9th Cir. 2002), which upheld non-prisoners' ability to view execution proceedings.

With this as a backdrop, the nature of Kozlowski's outgoing mail CRLD appears to fall into a gap not yet explicitly addressed by either the Supreme Court or the Seventh Circuit. Still, the *Koutnik* decision would at least appear to bind this court to apply the more demanding *Procunier* standard to outgoing mail. For one, Kozlowski's outgoing mail CRLD, even at its current, least restrictive iteration, is still considerably broader than the restriction at issue in *Turner*. In fact, the outgoing mail CRLD in this case not only

prohibits *all* mail regardless of content, it also applies to more than just DOC inmates, but also to county jail inmates *and* DHS patients.

Even accepting that the outgoing mail CRLD is more analogous to the regulation at issue in *Turner* -- because both involve communications *across* state-run institutions and not just within an individual institution -- the fact remains that the Supreme Court explicitly determined that the *Turner* standard should apply to incoming mail in *Thornburgh*, but the more demanding *Procunier* standard applied as to outgoing mail restrictions. As such, it appears the Seventh Circuit would remain unpersuaded that the *Turner* standard should apply here, so this court will analyze whether the outgoing mail CRLD is no greater than necessary to further a substantial governmental interest.

### A. Substantial interest

The court previously accepted that the July 9 security breach posed a substantial security risk due to (a) the potential for inmates to escape and (b) the smuggling of multiple dangerous weapons onto the premises.

### B. No greater than necessary

The court also accepts that Kozlowski might send mail in an attempt to carry out another escape plan or smuggling operation. That said, the court remains unconvinced that the *complete* ban on outgoing mail directed to DOC and county jail inmates, as well as other mental health patients, was and is no greater than necessary. This court previously explained its concerns with the defendants' justifications for the outgoing mail restriction in denying their motion for summary judgment on plaintiff's First Amendment claim:

13

For example, Dr. Van Rybroek declares, without elaboration, that screening Kozlowski's outgoing mail would require routing resources away from patient care and treatment, and defendants argue in their brief that Kozlowski could have used code in his outgoing mail to subvert staff. However, defendants provide *no* evidence supporting the conclusion that either concern made screening impossible. For example, there is no evidence about the potential cost of screening his mail, such as an explanation of how often Kozlowski sends outgoing mail or details about the staffing or financial requirements and limitations this would present at Mendota. Further, defendants have submitted no evidence of instances where Kozlowski used code in his outgoing mail or undertook other means of subterfuge, with the exception of suspected communications within communications.

…

If anything, VanSistene's and Cork's analyses of Kozlowski's grievances actually appear to support the opposite conclusion. VanSistene determined that the mail CRLD was inappropriate and suggested that Mendota staff either review Kozlowski's mail for contraband or ask the recipient to read it for security issues. While Cork ultimately reversed VanSistene's conclusion, he found that the mail restriction here was an appropriate "one-time" exception, but in so finding failed to explain (or even address) *why* VanSistene's proposed alternative was not feasible in April of 2016, *almost two years* after the security breach occurred.

(Dkt. #24, at 20-21.)

In fairness, defendants have attempted to respond to the court's expressed concerns in their subsequent submissions, but their response does not adequately address the concern that the outgoing mail CRLD (in either its past or current iterations) was or is no greater than necessary to address Mendota's security concern as to Kozlowski, even extending "particular deference and latitude" in light of defendants' positions as mental health care providers and administrators responsible for the patient and public safety. *See Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977), and *Procunier*, 416 U.S. at 414)). To begin, defendants have offered little legal authority to support a complete ban on mail going outside of the facility as a security measure.

Indeed, the cases cited by the parties and those the court has reviewed involve situations where, following the *screening* of a piece of outgoing mail, institution staff refused to send it or punished the plaintiff based on the content of the mail. The primary example of this is the Seventh Circuit's decision in *Koutnik*, in which prison staff withheld one letter that included Aryan symbolism staff believed posed a security risk. In concluding that the censorship passed muster under the *Procunier* standard, the Seventh Circuit paid particular attention to the content and purpose of the prohibited communication:

> Mr. Koutnik's correspondence was not an effort to establish "constructive, wholesome contact" with the outside community that would foster successful reintegration into society…; it was an effort to appeal to groups that would hinder, rather than foster, respectful human interaction, both inside and outside of prison. … Accordingly, the confiscation of his outgoing mail in this case did "further [the] important or substantial governmental interest" in rehabilitation. *Martinez,* 416 U.S. at 413, 94 S. Ct. 1800.

*Koutnik,* 456 F.3d at 785–86.

In contrast, the CRLD at issue here assumes that *all* outgoing mail Kozlowski would send to DOC or county jail inmates, or DHS patients, would serve an illicit purpose, rather than have the potential for any sort of "wholesome" or "constructive" benefit. While defendants assert that Kozlowski used his brother to send mail for improper purposes and would likely use code to carry out improper purposes, as this court pointed out previously, they have not specifically *described* a single instance of his doing either one, much less offered *proof* of such an instance. Instead, defendants now explain that they cannot provide evidence of Kozlowski's previous attempts to use code because Mendota staff have never been able to read his mail. Thus, they simply persist in their general assertion that because they consider Kozlowski dangerous and he refuses to undergo a psychological evaluation,

they must assume that *none* of his communications with jail and DOC inmates, or other DHS patients, serves a potentially rehabilitative or constructive purpose.

While the court appreciates the extremely challenging position Kozlowski's history and psychological profile presents, particularly given his apparent involvement in an escape attempt, defendants' position must still be met with skepticism for at least two reasons. *First,* accepting that Kozlowski has refused to participate in the evaluation Dr. Lane describes, this fact does not establish that prohibiting *all* communications with inmates and other DHS patients is no greater than necessary. At most, it establishes that it is as yet *unclear* whether Kozlowski's communications will be dangerous, thus warranting screening of all of his mail. Furthermore, Dr. Lane's opining that Kozlowski is "capable" and "likely to use" code, while understandable and admissible as an expert opinion, it is not *evidence* that Kozlowski has actually used code for an illicit purpose. Rather, it is Dr. Lane's professional opinion about Kozlowski. While Dr. Lane bases his opinion on multiple, objective facts -- Kozlowski's psychological profile, the facts tying Kozlowski to the 2014 escape plan and Kozlowski's prior communications with DOC inmates and patients -- none of those concrete facts confirm Lang's or others in DOC's suspicions that Kozlowski actually used code. To accept Dr. Lane's *opinion* that Kozlowski will use code as fact, without any corroborating evidence, would be to accept that *any* patient or inmate with a history of violence or escape attempts may be completely precluded from communicating with other patients or inmates, based on that history and a professional judgment. Even granting Dr. Lane the substantial deference his professional opinion merits in these circumstances, the absence of even a single, specific instance in which Kozlowski

has used the mail for improper purposes or used code to communicate surreptitiously makes it impossible for the court to agree that it was and continues to be necessary to impose a blanket prohibition.

*Second,* defendants' decision to permit Kozlowski to send money to Flakes at SCI in March of 2017 belie their position. That transaction illustrates that Mendota staff have been able work with the DOC to formulate acceptable means by which Kozlowski can foster his relationship with Flakes, a prospect that defendants imply is impossible. While the parties have not provided details about that transaction, it is reasonable to infer that Mendota staff trusted that Kozlowski was not sending the money for an illicit purpose, or, at the very least, that DOC staff at SCI, where Flakes was located, were in a position to thwart any use for improper purposes. Certainly a money transfer does not carry as obvious a risk as a direct written communication, but applying defendants' logic -- that Kozlowski's intelligence coupled with his personality disorder and antisocial features motivate him to carry out illicit acts via code -- it would seem that he could just as easily use a transfer of money to send a message or further an illicit purpose as he could with a letter. Accordingly, the evidence of record does not support a finding that Kozlowski's dangerousness alone justifies the continued outgoing mail CRLD.

Accepting the possibility that the court might find the current CRLD to be overbroad, defendants next argue that requiring Mendota staff to screen the mail is not feasible. Their position is two-fold. First, they point to Wis. Stat. § 51.61(1)(cm)1, which prohibits staff from reviewing mail of Mendota patients. This argument would have some force, except as previously noted above, Kozlowski is willing to waive his rights under this

statute and submit his mail to screening. Second, while defendants provide more information as to the burden that screening Kozlowski's mail would present, they have left some questions unanswered. For one, Dr. Lane states that Kozlowski writes "a lot" of mail, the screening of which would require Mendota to hire additional staff. This justification is too vague to be particularly helpful and, regardless, is compromised by Kozlowski's rejected offers to submit for approval a short list of individuals with whom he could communicate. Defendants have not explained why Kozlowski's proposal is unworkable, so it is not apparent that screening his mail would, in fact, require hiring additional staff or monopolizing a significant portion of staff time. Even if it did, the obvious solution would be to limit the amount of outgoing mail to a manageable number of pages or words per week or month. On this record, the court concludes that the outgoing mail CRLD (in both its past and current iteration) violates Kozlowski's rights under the First Amendment.

## II.     Qualified Immunity

This leaves a question as to whether monetary damages are barred by the doctrine of qualified immunity, which ordinarily protects government employees from liability for actions taken within the scope of their employment. Of course, qualified immunity would not apply if defendants' conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). "In determining whether a constitutional right has been clearly established, it is unnecessary for the *particular* violation in question to have been previously

held unlawful." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added)).

Instead, the question is whether the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. As to this question, plaintiff has the burden of identifying a "closely analogous case that established a right to be free from the type" of restriction imposed. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (quoting *Findlay v. Lendermon,* 722 F.3d 895, 899 (7th Cir. 2013)). To that extent, clearly established law should not be defined "at a high level of generality," but rather should be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

As mentioned already, defendants had a good faith argument that *Turner* permitted a more sweeping restriction in light of Kozlowski's apparent involvement in an escape attempt and history of manipulative and sociopathic conduct. While this court ultimately determined that the Supreme Court had clearly not abandoned the *Procunier* standard in evaluating restrictions on this type of outgoing mail, the case law defendants cite created a good faith argument as to contours of that standard's application with respect to the facts presented here. And while the Seventh Circuit's *Koutnik* decision may have anticipated Kozlowski's factual scenario, it did not do so to the point of establishing where his clearly established right is delineated as to time, place and manner restrictions on outgoing mail to other inmates and patients. Indeed, as discussed, even now some balancing of Kozlowski's right to send outgoing mail to inmates and patients still needs to be addressed.

In particular, given the severity of the security risk and the facility's vulnerability following the July 9, 2014, escape attempt, the first outgoing mail CRLD (precluding Kozlowski from sending all mail except legal mail) bore a logical connection to the legitimate interest in restoring security. Likewise, the subsequent iterations of the CRLD (permitting Kozlowski to send outgoing mail to family members and business-related mail starting on September 5, 2014, adopting the current CRLD restrictions on March 2, 2014, and adding the psychological evaluation option on August 2, 2016), were rationally related to the interest in maintaining security because Mendota staff could not assess Kozlowski's dangerousness, notwithstanding that this court has now determined some further lessening of the restriction is now due in the absence of a stronger showing of specific reasons not to do so.

Neither Kozlowski nor the court has been able to locate a case definitively holding that this series of restrictions and gradual easing of those restrictions did not meet balancing demanded by the *Procunier* standard. In other words, there is a good argument that Kozlowski's background and behavior, and their response within the limitations posed by staffing and budgetary shortages, presented atypical circumstances in which the immediate decision not to screen his mail and preclude him from sending mail to certain categories of recipients altogether was "no greater than necessary" to meet its interest in restoring security.[4] Accordingly, qualified immunity shields defendants from liability for money damages here.

---

[4] Although the application of qualified immunity is an objective test, the supplemental record supports a finding that defendants themselves were unclear as to how to proceed under the current

## III. Injunctive Relief

Since Kozlowski is not entitled to money damages, he has no right to a jury trial. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 966 (7th Cir. 2004) ("There is no right to a jury where the only remedies sought (or available) are equitable."). However, Kozlowski has also requested injunctive relief in the form of prohibiting defendants from restricting his mail, so the court will hold a telephonic hearing to determine appropriate injunctive relief unless the parties are able to stipulate timely to a reasonable compromise that addresses both of their interests.[5]

## IV. Separate Motion for Injunctive Relief (dkt. #43)

Finally, after the parties submitted their supplemental briefs, Kozlowski filed a motion for injunctive relief asking for the return of his legal materials that were confiscated on January 23, 2018. This motion will be denied. Not only is this motion unrelated to his First Amendment claim, Kozlowski has not actually adduced evidence suggesting that

---

state of the law. To that point, while the court previously commented that VanSistene's and Cork's disagreement over the mail restriction supported the conclusion that there were alternative means available to Mendota staff to address the security concern that Kozlowski presents, it also demonstrates an ongoing effort by defendants to weigh his right to send mail against the institution's equally valid interests in restoring and maintaining security. Finally, although the court is unwilling to defer completely to Dr. Lane's opinions that Kozlowski would use code, if given the chance, the evidence of record suggests that Lane grounded this belief on an understanding of what individuals with Kozlowski's psychological makeup and history might do. While ultimately these conclusions rendered the CRLD constitutionally overbroad without more specific justification for that opinion in the form of Kozlowski's actions (as opposed to psychological profile), it is not apparent that defendants violated a clearly established right in reaching a different conclusion under these circumstances.

[5] Obviously, if Kozlowski were to be found to have abused this limited right to outgoing mail to inmates and patients, defendants would be justified in returning to the blanket restriction to those recipients.

the confiscation of his legal materials hampered his ability to prosecute his lawsuit. As importantly, defendants' response eliminates the possibility of such a claim by clarifying that Kozlowski's materials were confiscated after the amount of paper he had accumulated created a fire hazard. Defendants further explain that while Kozlowski's documents have been taken to secure storage, he retains the ability to review them, so long as he submits a request with the property officer at Mendota. Kozlowski has not responded to defendants' representations, so it would appear that he concedes his continued access. Accordingly, this motion for separate injunctive relief will be denied.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #8) is GRANTED in part and DENIED in part as set forth above. The court concludes that the outgoing mail CRLD currently imposed upon Kozlowski violates his First Amendment right to free speech.

2. Both sides may have until **November 28, 2018**, to stipulate to a reasonable comprise of their respective rights, or failing that, to advise the court as to their final position as to a compromise for permanent injunctive relief to be enacted with respect to permitting Kozlowski to send mail to certain DOC prisoners, county jail inmates and DHS patients. Responses will be due **December 5, 2018**, with no replies unless ordered by the court. The court will hold a telephonic hearing on the parties' positions on **January 4, 2019, at 10:00 a.m.**

3. Plaintiff Gregory Kozlowski's motion for injunctive relief (dkt. #43) is

DENIED.

Entered this 14th day of November, 2018.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge